UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

**CIVIL ACTION (MASTER FILE) NO. 5:06-CV-316 - KSF**

**IN RE: AIR CRASH AT LEXINGTON, KENTUCKY, AUGUST 27, 2006**

**RELATING TO:**

*Hebert, et al. v. Comair*, et al., No. 5:07-CV-320

**OPINION AND ORDER**

\* \* \* \* \* \* \* \* \* \*

This matter is before the Court on the motion of Comair, Inc. ("Comair") to reconsider the denial of partial summary judgment on the legal availability of punitive damages. For the reasons discussed below, the motion to reconsider is granted, and partial summary judgment is granted in favor of Comair.

**I.    BACKGROUND**

This matter is the last one remaining from the crash of Comair Flight 5191 on August 27, 2006. The cases for the numerous plaintiffs and multiple defendants proceeded on a well-coordinated basis and settlement agreements were reached by all other passengers and by the Comair crew approximately two years ago. Comair's claims against the United States for the alleged negligence of the air traffic controller were settled by the United States' agreement to pay a substantial portion of the damages in the passenger cases.

This case on behalf of the estate and passenger Bryan Woodward's daughters, Lauren Hebert and Mattie-Kay Hebert, was filed ten days after the crash and is now more than four years old. This case got completely off track when, less than two months before an August 2008 trial date, counsel for these Plaintiffs felt obligated to withdraw from the case because Plaintiff Jamie

Hebert's "repeated refusals to follow advice of counsel and otherwise cooperate in her case have caused an irreparable deterioration of the attorney-client relationship rendering it impossible for her attorneys to continue to effectively represent her. The Firms also seek to be relieved as counsel due to the conflict which has developed as a result of certain legal positions advanced by Ms. Hebert." [DE 2768]. These law firms had earlier been substituted by Ms. Hebert for the first set of law firms she hired to prosecute the case. Present counsel, David Rapoport, did not become officially involved in the case until July 31, 2008, immediately before the August 4, 2008 trial date. At that point, the other passengers had reached settlement agreements, and the trial date in this case was rescheduled for December 2009.

The Court notes that a number of the passenger plaintiffs sued First Officer Polehinke individually. If the current question before the Court was whether Mr. Polehinke was grossly negligent so as to warrant punitive damages, that issue would have been left for a jury to resolve at trial. Mr. Polehinke was not sued individually in this case, however. Had Mr. Rapoport moved to add Mr. Polehinke as a defendant after being hired in 2008, the Court would have denied the motion as entirely too late in the proceedings.

The Court ruled in favor of Plaintiffs as a matter of law that the conduct of the pilots caused the plane crash. At trial on the issue of compensatory damages, a jury held Comair liable for $7.1 million in damages to Bryan Woodward's estate and to his daughters. In June 2010, the Court, on its own motion, removed Jamie Hebert as Next Friend for her daughter, Mattie-Kay, because of perceived conflicts among the Plaintiffs. David Royse, liaison counsel for all original passengers, was appointed Conservator for Mattie-Kay. There have been many opportunities to settle this case for a premium over the $7.1 million compensatory damage award, but the Plaintiffs have chosen not to settle. This remaining matter is only against Comair, not against the pilots, and concerns only the possibility of punitive damages as a result of any alleged gross negligence.

A trial on punitive damages was scheduled for February 1, 2011, but Plaintiffs created a conflict in late December 2010 regarding the status of Mattie-Kay Hebert. As a result, that trial could not go forward.

Meanwhile, Comair asked the Court to reconsider its June 6, 2008, decision [DE 2488] that Kentucky's punitive damages statute, KRS 411.184, did not apply to a wrongful death case because Kentucky Constitution Section 241 prohibited limitations on damages in wrongful death cases. The Court ruled earlier that KRS 411.184(2) and (3) would unconstitutionally limit the recovery of punitive damages. Although Section 241 delegated to the General Assembly the power to "provide how the recovery shall go and to whom belong," this Court interpreted that language as applying only to the designation of who is authorized to bring the wrongful death action and who may be the beneficiaries of any such action. Based upon early cases interpreting Section 241 and the wrongful death statute in effect at that time, the Court further interpreted the wrongful death statute as not "intended to do anything except declare the meaning of the constitutional provision" or as being coextensive with Section 241. *In re Air Crash at Lexington, Kentucky, August 27, 2006*, 2008 WL 2369785 at *5 (E.D. Ky. 2008).

This Court was unable to locate a Kentucky case in which a party raised a similar challenge to Plaintiffs' claim that KRS 411.184(2) and (3) were unconstitutional. Accordingly, it was the obligation of the Court to anticipate how the Kentucky courts would decide the question if presented to them. At the time, there were a few cases applying the punitive damages statute in a wrongful death action, but no party appeared to have raised the constitutional issue presented here. More than two years have passed since the Court's decision, and Kentucky courts have continued to apply KRS 411.184 to wrongful death actions. After a further review of the cases interpreting Section 241 and recent cases applying KRS 411.184 to wrongful death actions, this Court has concluded that its earlier decision was not a correct interpretation of Kentucky law.

3

## II.     ANALYSIS

### A.     Motion to Reconsider

The Sixth Circuit recognized the right of district courts to reconsider an interlocutory order under common law and Fed. R. Civ. P. 54(b). *Rodriguez v. Ten. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004), citing *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991). A district court may "afford such relief from [interlocutory orders] as justice requires." *Id.,* quoting *Citibank N.A. v. Fed. Deposit Ins. Corp.*, 857 F. Supp. 976, 981 (D.C.C. 1994). "Traditionally courts will find justification for reconsidering interlocutory orders when there is: (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Id.* Reconsideration is necessary in this case to correct a clear error and prevent manifest injustice.

### B.     Applicability of KRS 411.184 to Wrongful Death Actions

The key in determining whether KRS 411.184 may be applied validly to wrongful death actions is the scope of the state constitutional limitations on the Legislature's authority. Sections 14, 54 and 241 of Kentucky's Constitution were adopted in 1891 and are often interpreted together. *See Williams v. Wilson*, 972 S.W.2d 260, 267 (Ky. 1998). Section 14 "has been held to prevent abolishment of those jural rights which were well established prior to adoption of the Constitution." *Id.* at 267. Section 14 does not apply to wrongful death actions, because there was no common law right of action for wrongful death. *Smith's Adm'r v. National Coal & Iron Co.*, 135 Ky. 671, 117 S.W. 280 (1909) ("No cause of action existed at common law to recover for death."); *Ludwig v. Johnson*, 243 Ky. 533, 49 S.W.2d 347, 349 (1932) ("Under the common law, an action could not be maintained for the wrongful death of another."). Section 54 protects those jural rights from any limitation on "the amount to be recovered for injuries." Kentucky Constitution § 54; *Ludwig,* 49 S.W.2d at 349 ("It was the manifest purpose of the framers of that instrument (the Constitution) to

4

preserve and perpetuate the common-law right of a citizen injured by the negligent act of another to sue to recover damages for his injury."); *Caneyville Volunteer Fire Dept. v. Green's Motorcycle Salvage, Inc..* 286 S.W.3d 790, 811 (Ky. 2009) ("This section [54] has since come to be interpreted as meaning that the legislature may not take away a cause of action which existed as of the inclusion of this section into Kentucky's Constitution, which was ratified in 1891.").

Section 241 created and protected a cause of action for wrongful death in a similar manner to the protection afforded common law actions for non-fatal injuries. *Williams*, 972 S.W. 2d at 265. As a result, the Legislature cannot abolish the cause of action for wrongful death. However, specific language was included in Section 241 regarding what the legislature is authorized to do.

> *Until otherwise provided by law*, the action to recover such damages shall in all cases be prosecuted by the personal representative of the deceased person. *The General Assembly may provide how the recovery shall go and to whom belong*; and until such provision is made, the same shall form part of the personal estate of the deceased person.

Kentucky Constitution § 241, emphasis added. In *Clements v. Moore*, 55 S.W.3d 838 (Ct. App. Ky. 2000), the court said:

> While this Court has not hesitated to take an active role in extending the common law of torts when appropriate, we decline the invitation in the case *sub judice* so as not to invade the province of the Legislature, the branch of our government to which our constitution has granted "the [sole] responsibility for determining who can recover what damages for the wrongful death of another."

*Id.* at 840-41, quoting *Giuliani v. Guiler*, 951 S.W.2d 318, 325-26 (Ky. 1997) (Justice Cooper, dissenting). In *Martin v. Ohio County Hosp. Corp.,* 295 S.W.3d 104 (Ky. 2009), the Supreme Court of Kentucky expanded recovery for a loss of spousal consortium claim, saying the claim "is not premised on the spouse's death, so it is not specifically a part of a wrongful death claim under Kentucky law." *Id.* at 108.

Shortly after the Constitution was adopted, Kentucky's highest court held that the legislature was authorized under § 241 to adopt section 6 of chapter 1 of the Kentucky Statutes, which provided that "when the act is willful or the negligence is gross, punitive damages may be

5

recovered." *Louisville & N. R. Co. v. Kelly's Adm'x*, 100 Ky. 421, 38 S.W. 852, 855 (1897). Likewise, in *Clark's Adm'x v. Louisville & N. R. Co.*, 101 Ky. 34, 39 S.W. 840 (1897), the court recognized the "validity of an act of the general assembly fixing a 'degree' of negligence for which punitive damages may be recovered," and held "it follows that the general assembly can change or designate the 'degree' for which it may authorize a recovery of punitive damages." *Id.* at 841. "It suffices to say that this Court could not interpret KRS 411.184 to destroy a cause of action for punitive damages...." *Williams*, 972 S.W.2d at 267. However, "KRS 411.184 and .186 did not destroy the cause of action for punitive damages, but merely established standards to guide the jury in its determination of whether such damages are appropriate and the amount to be awarded." *Id*. at 270 (Justice Cooper dissenting).

Further evidence of the applicability of KRS 411.184 to wrongful death cases is found in recent decisions. In *Ragland v. Digiuro*, ___ S.W.3d ___, 2010 WL 4137183 (Ky. Ct. App. 2010), *petition for rehearing denied* January 19, 2011, a wrongful death case, the court said:

> Kentucky's punitive damages statutes, KRS 411.184 and KRS 411.186, were enacted "to further [Kentucky's] legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568 (1996). Those statutes "determin[e] the level of punitive damages that [Kentucky] will allow in different classes of cases and in any particular case [and they require] that the damages awarded be reasonably necessary to vindicate the State's legitimate interests in punishment and deterrence." *Id.*

*Id.* at *7. The court upheld the award of punitive damages, but directed entry of an amended judgment reducing the amount under the Due Process Clause of the United States Constitution.

In *Hyman & Armstrong, P.S.C. v Gunderson*, 279 S.W.3d 93 (Ky. 2008), the court held that punitive damages were authorized under the circumstances of that wrongful death case. In two recent wrongful death cases in which motions for discretionary review have been granted, the punitive damages statute was applied without any challenge. *University Medical Center, Inc. v. Beglin*, 2009 WL 102800 (Ky. Ct. App. 2009); *Fuel Transport, Inc. v. Gibson*, 2009 WL 3047578 (Ky. Ct. App. 2009). *Beglin* involved evidence of gross negligence, and the punitive damages

6

statute was applied to the question of employer liability. *Id.* at *5. These recent decisions are in addition to those applying KRS 411.184 before this Court's earlier decision. *See Reffitt v. Hajjar*, 892 S.W.2d 599, 607 (Ky. Ct. App. 1994); *Estate of Presley v. CCS of Conway*, 2004 WL 1179448 (W.D. Ky. 2004) and *Estate of Embry v. Geo Transportation of Indiana, Inc.*, 478 F. Supp.2d 914, 921 (E.D. 2007).

Accordingly, this Court was incorrect in its prior decision, and now holds that Kentucky courts would apply the punitive damages statute, KRS 411.184, to wrongful death cases, including the present case.

**C.    Comair Is Entitled to Partial Summary Judgment on Punitive Damages**

Under KRS 411.184(2) and (3), Plaintiffs must: (1) establish gross negligence by clear and convincing evidence; and (2) prove the employer "authorized or ratified or should have anticipated the conduct in question" in order to impose punitive damages on an employer for the gross negligence of its employees. KRS 411.184(3). Plaintiffs claimed Comair is liable for punitive damages under two theories – vicarious liability for the conduct of the pilots and gross negligence of Comair management.

1.    <u>Plaintiffs' Claim of Vicarious Liability for the Conduct of the Pilots</u>

Under KRS 411.184(3), Plaintiffs must show by clear and convincing evidence that Comair authorized, ratified or should have anticipated the conduct of Captain Clay and First Officer Polehinke on August 27, 2006. There is no evidence that Comair authorized the pilots to line up and attempt to take off from the wrong runway or that Comair ratified that conduct. To the contrary, the overwhelming evidence is that the Flight 5191 pilots violated Comair training, the procedures in Comair's manuals, sterile cockpit rules, and the required taxi briefing for the first flight of the day. [See DE 2123, pp. 10-16; DE 3827, pp. 6-9]. Captain Gregg Holthus, Comair's Manager of Flight Standards, testified that the crew made multiple errors and that their conduct violated numerous

7

Comair procedures and practices. [DE 3827, Ex. 11, pp. 251-58]. Capt. Holthus identified eighteen separate failures by this flight crew within a thirty-minute period. *Id.* at 253. When each sterile cockpit violation is counted as a separate item, the crew failures total 45. *Id.* at 254. Comair had numerous "crew surface movement protocols that were designed to establish and maintain situational awareness from prior to taxi all the way out to the runway." *Id.* at 215. He admitted that the Flight 5191 crew "failed in that regard." *Id.*

The question then becomes whether Plaintiffs presented clear and convincing evidence that Comair should have anticipated the reprehensible conduct of the Flight 5191 crew. Kentucky law requires evidence of a pattern of similar conduct by the employee, such that the employer should have reasonably expected the conduct to recur. In *McGonigle v. Whitehawk*, 481 F. Supp.2d 835 (W.D. Ky. 2007), a truck driver, who was intoxicated, rear-ended another vehicle. The victim sought punitive damages against the employer, Whitehawk, because Whitehawk knew when it hired the driver that he had two prior DUI convictions. The court granted summary judgment for the employer, noting that six and one-half years had passed between the last DUI conviction and the present incident and, further, that the DUI convictions had not occurred while the driver was employed by Whitehawk. The court distinguished *Kentucky Farm Bureau Mut. Ins. Co. v. Troxell*, 959 S.W.2d 82 (Ky. 1997) because that employer/insurance company "knew of an inappropriate pattern [of claims handling] conducted by its claims adjuster while the employee worked for the employer. *McGonigle*, 481 F. Supp. 2d at 842.

Similarly, in *Jones v. Blankenship*, 2007 WL 3400115 (E.D. Ky. 2007), a tractor-trailer rear-ended a vehicle that had stopped after rounding a curve. The driver had completed a certified training program and had not been cited for any moving violations during his employment. The Court held that his prior involvement in two minor accidents in parking lots did not "amount to a pattern of acts such that Blakenship's employer should foresee gross negligence in a two-vehicle highway collision." *Id.* at *5. Summary judgment was granted on the issue of punitive damages.

8

In *Estate of Presley v. CCS of Conway,* 2004 WL 1179448 (W.D. Ky. 2004), a semi-tractor trailer driven by Dickson crossed the median of a highway and headed into oncoming traffic. It clipped the rear of another truck and jack knifed, blocking traffic. Presley's vehicle hit head on into Dickson's truck and then was crushed when Witcher's truck hit him from behind. The evidence was that Dickson was driving over the speed limit, had failed to take a rest period as required under Federal Motor Carrier Safety regulations, and that he failed to operate his vehicle safely by crossing over the median. Witcher was driving too fast, using cruise control inappropriately under wet road conditions, and following Presley too closely. The court granted summary judgment in favor of the employers of the drivers, noting that neither driver had a poor driving record or history of getting into accidents. Witcher had been convicted of running a red light and was issued a few speeding tickets but it was over a ten-year period, and each time his company investigated the incident and took appropriate disciplinary measures. The court held that the employers could not reasonably have anticipated the Presley accident as a result.

Finally, summary judgment was granted in favor of an employer in *Patterson v. Blair*, 265 S.W.3d 241 (Ky. Ct. App. 2008). Blair was attempting to repossess an automobile for a car dealer when he encountered it at a stoplight on a public road. He demanded the driver/owner, Patterson, get out of the vehicle and, when he would not, Blair fired two shots in the front tire and two in the rear tire. Patterson sued Blair and Blair's father/employer/car dealer, claiming the employer should have anticipated Blair's conduct because Blair had a gun in his possession while a teenager and there was evidence that he usually carried a handgun all the time. The court rejected the punitive damage claim because there was no evidence that he previously repossessed vehicles in an impermissible manner, and there was no evidence that he had used a gun in an inappropriate manner in the past.

In the present case, there was no evidence that either Captain Clay or First Officer Polehinke had previously committed a similar error or had any history of similar conduct during their

years flying for Comair. The pilots completed all initial training and recurrent training. Captain Clay was an experienced pilot with nearly seven years of commercial flight experience at Comair and over 5,000 hours of total flight time. First Officer Polehinke was a pilot with Gulfstream International Airlines for five years before joining Comair. At the time of the accident, he had seven years of flight experience, including 6,564 hours of total flight time and 3,564 hours of flight time in the CRJ-100 aircraft. [DE 2133, pp. 5-6].

Plaintiffs argue the crash should have been anticipated because Comair did not include in its written checklist or in its Operations Manual a requirement that crews cross-check the heading indicator to the runway heading when the plane is aligned with the runway for takeoff. [DE 2348, p. 8]. However, Comair's Flight Standards Manager, Greg Holthus, testified: "It is a trained procedure from the earliest days of a pilot's training to reference instruments." [DE 2348, Ex. 13, p. 224]. Plaintiffs acknowledge "it is believed that as part of basic piloting practice most instrument-rated pilots routinely performed a cross-check of the heading indicator to the assigned runway before commencing a takeoff roll...." [DE 2348, p. 8]. Comair also notes that its Flight Standards Manual, Flight Operations Manual, Flight Operations Training Manual and Advanced Qualification Training Program were all Federal Aviation Authority approved, and there was no requirement that the checklists be amended. The Advisory Circular noted by Plaintiffs simply listed in an appendix "examples of standard operating procedures (SOP) that are identical or similar to some SOP's in use. These examples are not directive or prescriptive in nature and do not represent a rigid FAA view of best practices." [DE 3478, pp. 23-24]. Additionally, Comair pilots were trained to use all available resources to maintain situational awareness, including actively using Jeppesen charts, airport diagrams, signage and cockpit visual indicators, such as the Horizontal Situation Indicator and cockpit compasses. That training includes checking to ensure that the aircraft is lined up on the correct runway and setting the heading bug to the runway heading. *Id.* at 24-25. See also, DE 2123, pp. 10-11.

Plaintiffs urge that a wrong runway takeoff should have been anticipated based upon a Comair flight crew taking off from the wrong runway at Corpus Christi airport in January 2003. [DE 2348, pp. 10-11]. The evidence shows, however, that Comair incorporated this incident into its Runway Safety Program and used it during recurrent ground training as a specific example of what pilots should not do. Comair's Flight Safety specialist, Captain Paul McClasky, presented a PowerPoint program specifically discussing the Corpus Christi incident at recurrent ground training to all Comair pilots. [DE 3478, p. 26]. A March 2006 FAA IOSA Audit Report certified that all corrective action had been implemented by Comair and verified by the Audit Organization. It concluded: "The auditee is in conformity with IOSA Standards and the Audit is declared closed." [DE 3478, Ex. 3].

Plaintiffs argue Comair should have anticipated gross negligence from First Officer Polehinke because, during his simulator Initial Proficiency Check in 2002, he failed several safety maneuvers including a takeoff stall, missed approach, single-engine ILS, V1 cut, non-precision approach, and he conducted a no-flap landing. [DE 2348, p. 17, Ex. 33]. A year later, he did not properly execute a single-engine ILS landing and simulated engine failure occurring at V1. *Id.*, Ex. 35. In 2006, Polehinke was found to be deficient in both a non-precision and VOR approach. *Id.*, Ex. 36.

Comair responds that none of the mistakes by Polehinke related to improper taxiing procedures or wrong runway takeoffs. Moreover, Polehinke always passed his proficiency tests after retraining. On April 6, 2006, five months before the accident, Polehinke underwent a recurrent line operational evaluation and passed without any retraining. Finally, it was Captain Clay who taxied the aircraft and lined it up on the wrong runway, with Polehinke only taking the controls thereafter. There is no evidence of training failures of any kind for Captain Clay. [DE 2454, pp. 8-9; DE 2123 p. 14].

Under Kentucky law, Plaintiffs have not shown by clear and convincing evidence that there were similar incidents from which Comair should have anticipated the pilots' conduct that caused the crash of Flight 5191. There also is no evidence that Comair authorized or ratified the conduct of the pilots.

2.  Plaintiffs' Claim of Gross Negligence by Comair Management

Much of the evidence noted above also refutes Plaintiffs' claim that Comair management demonstrated a reckless disregard for the safety of its passengers. In addition to the items mentioned above, Comair passed an FAA Air Transportation Oversight System ("ATOS") review shortly before the accident. The FAA "recognizes the obligation of the air carrier to maintain the highest possible degree of safety." [DE 3478, p. 21].

> Under ATOS, the FAA's primary responsibilities are: (1) to verify that an air carrier is capable of operating safely and complies with the regulations and standards prescribed by the Administrator before issuing an air carrier operating certificate and before approving or accepting air carrier programs; (2) to reverify that an air carrier continues to meet regulatory requirements when environmental changes occur by conducting periodic reviews; and (3) to continually validate the performance of an air carrier's approved and accepted programs for the purpose of continued operational safety.

Id.

The Court's original decision regarding the sufficiency of the evidence to support a jury instruction on punitive damages noted that Plaintiffs provided "evidence that the conduct of the pilots on this flight was normal and not extraordinary." [DE 2488 at 12]. It also said Plaintiffs' experts gave "examples of Comair practices that reflected a reckless disregard for safety." Id. Subsequently, Comair moved to exclude testimony from experts and exhibits that reflected "legal conclusions." Comair's motion was granted in part. [DE 3176]. That Opinion said: "This Court agrees that expert opinions concluding the parties were grossly negligent or acted with reckless disregard for the safety of passengers are improper legal conclusions and usurp the Court's

function of instructing the jury." *Id.* at 3. Additional questions regarding the expert testimony were passed to trial. *Id.*

In its motion for reconsideration, Comair details more of the conclusory opinions from the Plaintiffs' experts, argues that they lack any analysis or factual support, and contends that such opinions are not admissible evidence. [DE 3836, pp. 5-9]. Comair also notes that the Court did not rely on a "clear and convincing evidence" standard in denying summary judgment initially and that some of Plaintiffs' allegations are distortions of the facts. [DE 3827, pp. 12-13,14-26].

For example, Plaintiffs claim that "[m]anagement made no changes to operational procedures after the Corpus Christi wrong runway takeoff incident" and that "[i]t learned nothing and made no changes to its procedures following the takeoff of its own aircraft on the wrong runway in Corpus Christi, Texas in 2003." [DE 2348, p. 34]. Plaintiffs do not deny, however, that "Comair Safety investigated [the Corpus Christi incident] and added a discussion of the incident and prevention tips to initial and recurrent pilot training presentations." [DE 3827, p. 12]. Both pilots had taken this training. *Id.* Additionally, Comair put an initiative in place specifically on runway safety in 2004 and followed it with improvements in 2005 and 2006. *Id.*, Ex. 13, pp. 208-209.

Plaintiffs also claimed that Comair exhibited a "cavalier attitude toward safety" as evidenced by the fact that "reports of Comair pilots being involved in flight incidents including runway incursions were steading [sic] increasing" for the two years preceding the crash. [DE 2348, p. 34]. Runway incursions is defined as aircraft penetration of a runway safety area, and is much broader than wrong runway takeoff incidents. [DE 3827, p. 12]. There were no Comair wrong runway takeoffs after 2003 until the crash of Flight 5191. Comair also initiated ASAP reporting in 2004, which encouraged pilots to report incidents to provide the FAA and the carrier with knowledge of safety issues. *Id.* at 12-13. Reporting increased significantly as a result, but the increased reporting reflects efforts to improve safety, rather than the opposite. *Id.*

Plaintiffs' expert, Donald Sommer, discusses the facts surrounding the crash at length and is quite critical of the crew's "numerous errors" and "numerous violations" of regulations and Comair prescribed procedures. [DE 3836-3, p. 5]. He then concludes, with virtually no factual support:

> The conduct and recklessness of the two crew members and the sheer numbers of their gross violations of FARs, company policy, the Comair operations manual and basic airman principles that were required to be observed for safe piloting to insure safe flight, especially in Part 121 operations, such as Comair, which are present in the evidence surrounding this crash, represent severe shortcomings of Comair management. They reflect management's failure to train and monitor Comair personnel assigned to supervise and conduct flight operations to insure that those people who perform and their duties [sic] to achieve the highest level of safety. ... [T]he facts in this case demonstrate that the conduct of the crew of 5191 represented the Comair norm.

*Id.* Later in his report, Mr. Sommer notes that some Comair personnel had described the Flight 5191 crew as "by the book" and represented professionalism. *Id.* at 20. Without further factual support, he concludes: "Since these two pilots were, in fact, not professional or by the book or even moderately safe it is highly likely that they represent a standard of operational procedures and a trend of unsafe operation in Comair flying crew members which was orchestrated and perpetuated by management." *Id.* These conclusions are but rank speculation and certainly do not constitute "clear and convincing evidence" that Comair's management was grossly negligent.

In a similar manner, Plaintiffs' expert, Barry Schiff, made a bare, conclusory attribution of the pilots' errors to Comair management. "Because there is no reason to disbelieve those who were interviewed about the captain and the first officer, one can only conclude, therefore, that the lax, substandard performance of the mishap crew was regarded as more or less normal at Comair." [DE 3836-8, pp. 8-9]. The Court agrees that such speculative opinions are not admissible.

It is the opinion of this Court that Plaintiffs have failed to present clear and convincing evidence of gross negligence on the part of Comair management such that it should be held liable for punitive damages for the conduct of the pilots. Accordingly, partial summary judgment will be granted in favor of Comair on the issue of punitive damages.

**III. CONCLUSION**

**IT IS ORDERED** that the motion of Comair, Inc. for reconsideration of the Court's June 6, 2008 and May 28, 2009 orders regarding punitive damages [DE 3827] is **GRANTED** and Comair is entitled to partial summary judgment in its favor. A separate, final judgment including the amount of compensatory damages will be entered after consultation with counsel regarding its form.

This February 2, 2011.



Signed By:
*Karl S. Forester* KSF
United States Senior Judge